## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES PARK, derivatively on behalf of ALLBIRDS, INC., | Case No. |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| JOSEPH ZWILLINGER, NEIL BLUMENTHAL, DICK BOYCE, TIMOTHY BROWN, MANDY FIELDS, DAN LEVITAN, and ANN FREEMAN, | |
| Defendants, | |
| and | |
| ALLBIRDS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

\

## INTRODUCTION

Plaintiff James Park ("Plaintiff"), by and through his undersigned attorneys, derivatively and on behalf of Nominal Defendant Allbirds, Inc. ("Allbirds" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Joseph Zwillinger ("Zwillinger"), Neil Blumenthal ("Blumenthal"), Dick Boyce ("Boyce"), Timothy Brown ("Brown"), Mandy Fields ("Fields"), Dan Levitan ("Levitan"), and Ann Freeman ("Freeman") (collectively, the "Individual Defendants" and with Allbirds, "Defendants"), for and among other things, breaching their fiduciary duties to Allbirds stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and violating the federal securities laws.

As for Plaintiff's complaint against Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allbirds, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought against the members of Allbirds's Board of Directors ("Board") for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct, which resulted in substantial damage to Allbirds and its

stockholders.

2.      On March 9, 2023, the Company disclosed a net loss for 2022 of over $100 million which included a gross profit margin decline of more than 9% from 2021. Allbirds also disclosed that it missed previously given financial guidance.

3.      Despite the Company and several of its directors and officers previously stating contrary statements in public documents and conference calls, Defendant Zwillinger, who is the Company's Chief Executive Officer ("CEO"), admitted that the Company "overemphasized products that extended beyond our core DNA," and that "[b]ecause we were spending significant time and resources on these products that did not resonate well, we underinvested in our core consumers' favorite products."

4.      Following the revelation of these financial results, Allbirds's stock plummeted 47%.

5.      After this huge decline, two securities class actions were filed against the Company and certain of its directors and officers as well as underwriters of the Company's initial public offering ("IPO"). The first of the actions was filed on April 13, 2023 styled as *Shnayder v. Allbirds, Inc., et al.*, No. 3:23-cv-01811-AMO (N.D. Cal.) (the "*Shnayder* Action"). Among others, the *Shnayder* Action named Allbirds, Zwillinger, Brown, Blumenthal, Boyce, Fields, and Levitan as defendants and asserted violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act. The *Shnayder* Action was brought on behalf of a putative class of all persons and entities that purchased, or otherwise acquired, Allbirds Class A common stock pursuant or traceable to the Offering Materials (defined below) or Allbirds securities between November 4,

2021, and March 9, 2023, inclusive. The second action was filed on May 16, 2023 styled as *Delgado Jr. v. Allbirds, Inc., et al.,* No. 3:23-cv-02372-AMO (N.D. Cal.) (the "*Delgado* Action"). The *Delgado* Action included the same relevants defendants and asserted the same claims as the *Shnayder* Action. On July 28, 2023, the *Shnayder* Action and the *Delgado* Action were consolidated and referred to herein as the "Securities Class Action."

6.       Given the Securities Class Action, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, as well as its directors and officers.

7.       Due to the Individual Defendants' breaches of fiduciary duties and other misconduct, Allbirds sustained substantial damage and irreparable injury to its reputation. On Allbirds's behalf, Plaintiff seeks to recover damages and remediate the internal control weaknesses that afflict Allbirds.

8.       Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Allbirds will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## JURISDICTION AND VENUE

9.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §§1391 and 1401. The acts and conduct complained of herein occurred in substantial part in this District, and Allbirds is incorporated within this District.

## PARTIES

14.     Plaintiff is a current Allbirds stockholder who has continuously held Allbirds stock at all relevant times.

15.     Nominal Defendant Allbirds is a Delaware corporation. Its principal executive offices are located at 730 Montgomery Street, San Francisco, CA 94111. Allbirds's common stock trades on Nasdaq under the ticker symbol "BIRD."

16.     Defendant Zwillinger is the Co-Founder of Allbirds. He has been Allbirds's CEO since May 4, 2023, serves as its President and an Allbirds director since the Company's inception. Zwillinger also served as Co-CEO from October 2015 until May 4, 2023. As of March 31, 2023, Zwillinger owns 12,810,945 Allbirds Class B[1] common stock shares and holds 19.9% of the Company's total voting power. Zwillinger's compensation for 2021 included a salary of $297,596 and total compensation was $392,827. Zwillinger's compensation for 2022 was $365,462 in salary, $2,012,471 in stock awards, $2,059,226 in option awards, other compensation of $12,051 for total compensation of $4,449,210.

---

[1] Each share of Allbirds Class A common stock is entitled to one vote and each share of Allbirds Class B common stock is entitled to ten votes.

17.    Defendant Blumenthal has been a director of Allbirds since 2018 and a member of the Compensation and Leadership Management Committee (the "Compensation Committee"). As of March 31, 2023, Blumenthal owns 153,105 Allbirds Class B common stock shares. In 2022, Blumenthal received total compensation of $192,496.

18.    Defendant Boyce has been a director of Allbirds since 2016 and a member of the Audit Committee and Sustainability, Nomination, and Governance Committee ("Governance Committee"). As of March 31, 2023, Boyce owns 1,850,050 Allbirds Class B common stock shares and holds 3.0% of the Company's total voting power. In 2022, Boyce received total compensation of $219,996.

19.    Defendant Brown is the Company's Co-Founder and Chief Innovation Officer since May 4, 2023. Brown served as Co-CEO from October 2015 until May 4, 2023, and as an Allbirds director since May 2015. As of March 31, 2023, Brown owned 50,000 Allbirds Class A common stock shares, 13,955,925 Allbirds Class B common stock shares and holds 22.1% of total voting power. Brown's compensation in 2021 was $297,596 in salary and total compensation of $392,827. Brown's compensation in 2022 was $365,462 in salary, $2,012,471 in stock awards, $2,059,226 in option awards, and other compensation $12,033 for total compensation of $4,449,192.

20.    Defendant Fields has been a director of Allbirds since 2020 and is Chair of the Audit Committee. As of March 31, 2023, Fields owned 64,583 Allbirds Class B common stock shares. In 2022, Fields' total compensation was $204,996.

21.    Defendant Levitan has been a director of Allbirds since 2016. Levitan serves as Chair of the Compensation Committee and a member of the Audit Committee. As of March 31, 2023, Levitan owned 75,796 Allbirds Class A common stock shares, 16,824,330 Allbirds Class

6

B common stock shares and holds 26.9% of the Company's total voting power. Levitan is a Managing Member of Maveron LLC ("Maveron"), a venture capital firm he co-founded in January 1998. Maveron beneficially owns 16,824,330 Allbirds Class B shares and holds 26.9% voting power.[2] In 2022, Levitan's compensation was $209,996.

22.    Defendant Freeman has been a director of Allbirds since 2022, and is a member of the Governance Committee. In 2022, Freeman's compensation was $267,942.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

23.    By reason of their positions as officers and/or directors of Allbirds, and because of their ability to control the business and corporate affairs of Allbirds, the Individual Defendants owed Allbirds and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Allbirds in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Allbirds and its shareholders.

24.    Each director and officer of the Company owes to Allbirds and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

25.    The Individual Defendants, due to their positions of control and authority as directors and/or officers of Allbirds, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.    To discharge their duties, the officers and directors of Allbirds were required to exercise reasonable and prudent supervision over the management, policies, controls, and

---

[2] The information reflects the holdings of Maveron as of March 31, 2023. While Defendant Levitan has control over the voting and investment power of the shares, the shares are contractually assigned to Maveron and its affiliates. *See* the 2023 Proxy Statement pp. 37-38 nn. 1; 11.

operations of the Company.

27.     The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Allbirds, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

28.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

29.     To discharge their duties, the officers and directors of Allbirds were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Allbirds were required to, among other things:

(a)     Ensure that Allbirds was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Allbirds's own Code of Conduct;

(b)     Conduct Allbirds's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Allbirds conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Allbirds and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Allbirds's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

30.     The Individual Defendants, because of their positions of control and authority,

were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Allbirds.

31.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Allbirds and were at all times acting within the course and scope of such agency.

32.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## ALLBIRDS'S CODE OF BUSINESS CONDUCT AND ETHICS

33.    The Company has a Code of Business Conduct and Ethics (the "Code of Conduct") which applies to "every employee, officer and director of the Company."

34.    The Code of Conduct prohibits unethical and illegal practices and requires compliance with all laws and regulations applicable to Allbirds's business. Under the policy of the Code of Conduct, it states in relevant part:

### 1. HONEST AND ETHICAL CONDUCT

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

### 2. LEGAL COMPLIANCE

Obeying the law is the foundation of this Code. Our success depends upon each employee, officer and director operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility

35.    The Code of Conduct discusses the importance of full, fair, accurate, timely and understandable disclosures and the obligation to report any violation of the securities laws under "Financial Integrity," states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. ***Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations***. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee of the Board (the "***Audit Committee***") or one of the other compliance resources described in Section 16.

(Emphasis added).

36.     The Code of Conduct, under the heading of "Fair Dealing," states in relevant part:

Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Statements regarding the Company's services must not be untrue, misleading, deceptive or fraudulent.

## DUTIES OF THE CORPORATE GOVERNANCE GUIDELINES

37.     Allbirds maintains Corporate Governance Guidelines that detail additional obligations for Board members. These obligations include that "Directors must act with integrity and demonstrate a commitment to the Company, the Company's public benefit, values, and business, and long-term stockholder value."

## AUDIT COMMITTEE MEMBERS'S DUTIES

38.     The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things: Allbirds's risk management practices and policies; the integrity of

Allbirds's financial statements; Allbirds's compliance with legal and regulatory requirements; and the effectiveness and performance of Allbirds's internal audit function.

39.     The Audit Committee has additional powers and duties, including:

**6. Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

*     *     *

**12. Risk Assessment and Management.** The Committee will review and discuss with the Board, management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to privacy, technology, information security (including cyber security and back-up of information systems), competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's privacy and information security policies and practices and the internal controls regarding privacy and information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

**13. Internal Auditors.** If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

**14. Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including the Company's information and cyber security systems, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any

special audit steps adopted in light of any significant deficiencies and/or material weaknesses.

*      *      *

**16. Internal Control Report.** At least annually (if required by applicable Exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

<h2 style="text-align:center">DUTIES OF THE GOVERNANCE COMMITTEE MEMBERS</h2>

40.     Allbirds' Governance Committee has a charter which imposes additional duties for its members. These duties include obligations relating to overseeing the development and adequacy of the Corporate Governance Guidelines, including periodically reviewing and assessing "the adequacy of the Company's corporate governance guidelines" and, as appropriate, recommending "any proposed changes to the Board for its consideration and approval."

<h2 style="text-align:center">SUBSTANTIVE ALLEGATIONS</h2>

<h3 style="text-align:center">Background</h3>

41.     Allbirds is a footwear and apparel company which makes simple, eco-friendly products. The Company's main products are lifestyle and athletic shoes. The Company's core products include the Dasher and the Runner style.

42.     On August 31, 2021, the Company filed with the SEC its Registration Statement on Form S-1 in connection with its IPO. After a number of amendments, the Registration Statement was declared effective on November 2, 2021 (the "Registration Statement"). On November 4, 2021, the Company filed with the SEC its prospectus on Form 424B4 which was incorporated into the Registration Statement. The Registration Statement and prospectus are

13

referred collectively as the "Offering Materials."

43.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan signed the Offering Materials.

44.     Allbirds sold approximately 16,850,700 shares of Class A common stock at a price of $15 per share in the IPO. The Company received proceeds of approximately $237 million in the IPO.

**The Material Risks of Allbirds's Core Operations**

45.     In the Offering Materials, Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan plugged the Company's core strengths. These included the ability to innovate and make new products while continuing to focus on the Company's core products. Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan acknowledged their awareness of the materials risks in connection with the retention of existing customers and expansion of the customer base as the Offering Materials stated in part:

> Our success depends in large part upon widespread adoption of our products by our customers. In order to attract new customers and continue to expand our customer base, we must appeal to and attract customers who identify with our sustainable footwear and apparel products. If the number of people who are willing to purchase our products does not continue to increase, if we fail to deliver a high quality shopping experience, or if our current or potential future customers are not convinced that our products are superior to alternatives, then our ability to retain existing customers, acquire new customers, and grow our business may be harmed.
>
> *     *     *
>
> If existing customers no longer find our products appealing, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.
>
> If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.

46.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan acknowledged their awareness of the materials risks in connection with anticipating customer preferences and product trends:

> Our success depends on our ability to identify, originate, and define product trends within the footwear and apparel industry, as well as to anticipate, gauge, and react to changing consumer preferences in a timely manner. However, lead times for many of our products may make it more difficult for us to respond rapidly to new or changing product trends or consumer preferences. For example, our lead times may be longer due to our preference for ocean shipping and other more sustainable supply chain practices to reduce carbon emissions, which may take longer and be more expensive than less sustainable alternatives. If we are unable to introduce new products in a timely manner, or our new products are not accepted by our customers, our competitors may introduce similar products in a more timely fashion, which could hurt our goal to be viewed as a leader in comfortable and sustainable footwear and apparel. All of our products are subject to changing consumer preferences regarding footwear and apparel, generally, and sustainable footwear and apparel, specifically, that cannot be predicted with certainty. Our new products may not receive consumer acceptance as consumer preferences could shift rapidly to different types of styles and our future success depends in part on our ability to anticipate and respond to these changes…If we fail to anticipate accurately and respond to trends and shifts in consumer preferences, we could experience lower sales, excess inventories, or lower profit margins, any of which could have an adverse effect on our results of operations and financial condition.

47.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan recognized their awareness of the materials risks in connection with failing to forecast accurately customer demand and strategically invest in products with the Offering Materials stating in relevant part:

> To meet anticipated demand for our products, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for particular products. Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in customer demand for our products or for products of our competitors, changing consumer preferences, changing product trends, our failure to accurately forecast consumer acceptance of new products...If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to customers.
>
> Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of

excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

### Statements Regarding Allbirds's Active Engagement and Investment in its Core Customer Base

48.     In the Offering Materials, Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan represented that Allbirds had a "deep connection" with customers, with the Offering Materials stating in relevant part:

By making great products and telling the story of an inspirational, purpose-driven brand, we have formed a deep connection with our community of customers. We have sold our products to over four million customers since our founding. As of June 30, 2021, we had more than two million people on our email list and nearly one million followers on social media. Our high Net Promoter Score, which has consistently been 83 or higher since the first quarter of 2019 and was 86 for the first half of 2021, demonstrates our strong following and growing brand advocates who love Allbirds. ***Approximately 53% of our net sales in 2020 came from repeat customers.*** This is true globally, as our customers span 35 countries, and 24% of our net revenue in 2020 came from outside the United States.

(Emphasis added).

49.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan flaunted the Company's ability to "own the customer experience" and engage its customer base with the Offering Materials stating in relevant part:

As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine who our customers are, what is important to them, and what products are most relevant and

16

when, allowing us to create a strong connection with our customers. We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line. Further, to illustrate the importance of engaging our customer base, the average spend by a repeat customer in a given cohort is over 25% more in their second year as compared to what was spent in the first year, and the average spend by a repeat customer continues to increase each subsequent year.

50. Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan represented that Allbirds was working to develop its relationships with repeat customers further and that it was well positioned to capture a greater market share of the apparel and footwear industry, with the Offering Materials stating in relevant part:

*By deepening our relationships with our repeat customers*, we believe we are well-positioned to capture a greater share of the approximately seven pairs of shoes and 68 pieces of clothing that the average American bought in 2018 and realize substantial growth in our business. We believe there is continued opportunity to grow our closet share as we further expand our brand and product selection, as evidenced by the fact that approximately 80% of orders from repeat customers in the six-month period ended June 30, 2021 included a different item than in their first order and 26% of those orders were for multiple items.

(Emphasis added.)

51. On November 30, 2021, Allbirds filed with the SEC a Form 8-K announcing its third quarter 2021 financial results. In the press release attached to the 8-K, Defendant Zwillinger stated, in part:

"We are pleased to deliver strong third quarter performance, which reflects solid execution by our teams and robust global demand for the Allbirds brand," said Joey Zwillinger, Co-Founder and Co-CEO. "Revenue was strong across channels and geographies, growing 33% year over year, with notable strength in U.S. physical retail. *Importantly, we saw strong consumer response in the quarter to our new product innovation, including our new Perform Apparel line.*"

"We're at the forefront of a generational change in consumer values and purchase behaviors, led by our mission to make better things in a better way—which means we're aligning our purpose of reversing climate change with our product quality and financial outcomes. *Looking ahead, we believe Allbirds is uniquely*

17

***positioned in an exceptionally large and growing market.*** As we continue to execute our strategic plan, we are focused on accelerating growth, creating value for our shareholders and building for a multi-decade journey."

(Emphasis added).

52.     On the same day, in an earnings call with analysts and investors, Defendant Zwillinger stated that the Company made "strategic choices" in their R&D investments and distribution model which "helped to create important and structural advantages that we believe will allow us to outmaneuver competitors well into the future." Zwillinger represented that Allbirds was focused on repeat purchasers and touted the Company's repeat purchase rate of 43%. On the earnings call, Defendant Brown emphasized Allbirds's ability to predict customer buying trends, stating in part: "We have spent the last 5 years building a product platform that marries product innovation through natural materials and a purpose-driven brand that meets consumers where they are headed, not where they are."

53.     Further on the earnings call, Allbirds's Chief Financial Officer ("CFO"), Michael Bufano ("Bufano"), responded to an analyst's question on inventory levels by emphasizing the Company's focus on its core products, stating in part: "I would say if we were going to, we would probably really lean into our core products, core colors, core sizes, the stuff that we know there's a nice long tail on and long life on."

54.     On February 23, 2022, the Company filed with the SEC a Form 8-K that attached a press release announcing the fourth quarter and full year 2021 financial results. These figures included a net loss of $45.4 million and an adjusted EBITDA loss of $11.7 million for the year. Allbirds also announced a net loss of $10.4 million for the fourth quarter of 2021. The Company provided guidance for 2022, including gross profits of $187.5–$195 million, representing a gross margin percent of 53.1%, and adjusted EBITDA of negative $13 million to negative $9 million, including an estimated $8 million of public company costs.

55.     On the same day, Allbirds held an earnings call with analysts and investors to discuss the financial results for the fourth quarter and full year of 2021. On the call, Defendant Zwillinger stated that Allbirds was "laser-focused on generating meaningful and durable profitability and noted the "great progress" in 2021 "with adjusted EBITDA coming in ahead of our expectations for the fourth quarter and full year, continuing our disciplined march towards our long-term profitability targets."

56.     Further on the earnings call, Defendant Zwillinger discussed Allbirds's decision to increase its wholesale distribution strategy, explaining it as a continuation of the focus on the Company's core products, stating in part:

> It's about 25% of the mix, and it's not something we take for granted that we're going to build that overnight. And so showing up in the right places in front of the right consumers is something that's important. But as we said, first of all, a couple of points to remind you of when you're thinking about this, Jim. **One is that it's incremental to the core model.** So meaning that additional sales and EBITDA are all going to be accretive to kind of the medium-term targets that we've set out there.
>
> And further, **we actually think that this will accelerate our ability to capture the demand in our core channels.** So that halo, we've seen it before. And I think it's kind of – it's something we can really bank on that, that should translate to great owned channel sales, and we're focused on a lot of execution there.

(Emphasis added).

57.     On May 10, 2022, the Company filed with the SEC a Form 8-K that attached a press release announcing the financial results for the first quarter 2022. In the press release, Defendant Zwillinger was quoted, noting the "Company's excellent performance in our U.S. business" with "net revenue growth of 35% in the first quarter" and increased net revenue growth for the total business "on both a one- and two-year basis in the quarter, up 26% and 49%, respectively." Zwillinger further stated that the Company was "focused on driving the topline through our core growth pillars of delivering product innovation, growing our store portfolio and

expanding internationally." Zwillinger announced the Company's expectation of "strong full year revenue growth of 21% to 24% in 2022" with "our digital-savvy, omni-channel operating model" supporting continued growth and "meaningful value for our shareholders in the years ahead."

58.     On August 8, 2022, the Company filed with the SEC a Form 8-K that attached a press release announcing the financial results for the second quarter 2022. In the press release, Zwillinger touted the Company's ability to predict customer trends:

> Our data-rich business model allows us to quickly identify changes in consumer behavior... As we continue to navigate this difficult environment, we have implemented Simplification Initiatives designed to generate cost of goods savings, streamline workflows, and lower operating costs. The savings generated from these initiatives will allow us to continue to invest in our brand, our products, our customers, and our Flock, setting us up to continue to take share and keeping us on track to achieve our medium-term targets.

59.     The press release further announced that Allbirds was letting go of 8% of its global corporate workforce. A Company spokesperson stated that the layoffs followed an evaluation of "roles and processes in each department, and in each market, to ensure our operating structure is set-up for the next phase of growth. In this process, we looked for ways to streamline workflows, reduce duplicative efforts, and put past learnings and operational insights into practice."

60.     The press release also included the announcement that gross profit declined to $28.2 million from $38.1 million one year earlier, and that gross margin declined by 20% from the previous quarter primarily due to "noncash write-down of inventory primarily related to certain first-generation apparel products, higher distribution center and logistics costs, lower mix of international sales, and unfavorable foreign exchange rates."

61.     On the same day, Allbirds held an earnings call with analysts and investors to discuss the financial results. Defendant Zwillinger touted the Company's business model and

"direct relationship with customers."  Zwillinger continued his discussion about the Company's business model, stating: "One of the greatest advantages of our business model is that our sophisticated data platform and our direct relationship with our customer allows for rapid visibility into changes in demand signals." Zwillinger stated that the Company was planning on expanding its product offering with the end goal of a "robust long-term pipeline" and continued by stating:

> Within product, we will further enhance our emphasis on footwear products and innovation to expand our offering across lifestyle and performance footwear. The highlight from the second quarter was our successful Tree Flyer launch and its unique midsole technology, SwiftFoam. Tim will talk through what's on deck in the second half of the year, why we're excited about our recent materials innovation and how these enable a robust long-term pipeline.

62.    Zwillinger also plugged the Company's "consumer-focused innovation" and ability to pivot to what was working with the customer base, stating in part:

> I believe that one of the most important characteristics of an innovative company is the ability to quickly remind what is working and what misses the mark and having the agility and prudence to pivot accordingly.
>
> *    *    *
>
> As a consumer-obsessed company we look to maintain a best-in-class NPS,[3] which we have continued to deliver. We also focus on repeat purchase rate, which is strong at over 40%. That lets us know that our customers love our products.
>
> Similarly, we also track customer LTV,[4] which continues to grow as we provide new products that our customers love and offer them additional occasions to buy in our stores and, more recently, in our third-party partner stores.
>
> These metrics demonstrate a best-in-class customer experience with a modern distribution model, all inside an enormous and growing addressable market, where we still have low double-digit awareness. Collectively, this gives us great confidence in our future potential. I firmly believe that the strength of our operating model will continue to propel us towards our medium-term financial

---

[3] Net Promoter Score ("NPS") is a measure used to gauge customer loyalty, satisfaction, and enthusiasm with a company.
[4] Lifetime Value ("LTV") is an estimate of the average revenue that a customer will generate throughout their lifespan as a customer.

and sustainability target, ***and we continue to win with consumers that we believe are increasingly aligned with the core tenets of the Allbirds brand.***

(Emphasis added).

63.     CFO Bufano emphasized the Company's new initiatives which were focused on "automating and expanding" the supply chain and "streamlining our operating structure," which would position the Company for "accelerated profitable growth" and continued by stating:

> In this operating environment, we are focused on controlling what we can control and have implemented a series of Simplification Initiatives focused on automating and expanding our supply chain and streamlining our operating structure. These Simplification Initiatives are expected to generate annualized SG&A expense savings of $13 million to $15 million beginning in 2023 and significant cost of revenue savings in future years. We will reinvest some of these savings into building brand momentum through product innovation, marketing, retail stores, and marquee third party partnerships. ***We are confident that these investments in the customer, coupled with our Simplification Initiatives, will help us navigate this consumer slowdown and position us for accelerated profitable growth*** when the headwinds pass.

(Emphasis added).

64.     Zwillinger commented on the Company's discontinuation of its first-generation apparel products, describing the write-down as a "focus on a simplified lineup of apparel that showcases the versatility of our natural materials." Defendant Brown discussed the liquidation of inventory in the context of the Company's "Simplification Initiatives" by stating in part:

> There are nonrecurring costs associated with the Simplification Initiatives. We expect most of these to be incurred in 2022, but we'll keep investors updated on our progress. Let me walk you through our current estimates of those expenses.
>
> One, we are liquidating end-of-life inventory, primarily first-generation apparel. We expect the nonrecurring net expense related to this liquidation to be $12 million to $14 million. The bulk of that expense already came through as a noncash charge of $11.6 million in Q2.

65.     Defendant Zwillinger answered an analyst's question regarding Allbirds's repeat customers with assurances that the Company was investing in its core customers, stating in part:

> [W]e're seeing absolutely no falloff in the number of repeat purchases that people

are making.                              *      *      *

> Even despite the fact of what we're seeing on the demand side, this isn't going to
> be a knee-jerk reaction to a downturn. We're going to continue to invest not just
> in marketing as a line item but really specifically around brand and…we know
> we're aligned with what the customer wants, and we're going to double down.

66.     CFO Bufano stated that "we know we have the inventory in place to meet

demand" and reassured that the Company's promotions would "help us move through inventory

as well."

67.     Zwillinger described the "love that we're seeing from our customers"

demonstrated "trough repeat purchase" which was "a testament to the strong health of the

brand."

68.     On November 8, 2022, the Company filed with the SEC a Form 8-K that

attached a press release which announced the financial results for the third quarter 2022. In the

press release, Defendant Zwillinger described a strong quarter of sustainable growth, stating in

part:

> We delivered a strong quarter in what remains a highly dynamic operating
> environment. I am proud that we exceeded our Q3 adjusted revenue and adjusted
> EBITDA guidance targets while also delivering on our sustainability goals.
> Looking ahead to year end and 2023, we continue to expect macro headwinds to
> persist but believe that our brand, our growth strategy, and simplification
> initiatives position us well to emerge strongly from this period. Thanks to the
> team's hard work I remain confident in our ability to continue to execute into the
> holiday season and next year.

69.     On the same day, Allbirds held an earnings call with analysts and investors to

discuss the third-quarter financial results. Defendant Zwillinger stated that the Company was on

track to meet customer demand, stating in part:

> [W]e feel really good about the balance that we're making in terms of meeting
> the consumer where they are for the moment, meeting the industry and still being
> bestin- class in terms of the premium nature of how we're approaching discounts

and promotions. So feeling generally pretty good about that, and it's all on track with what we kind of signaled to you all at the last quarterly call.

**CFO Bufano Resigns and the Company Reports Bleak 2022 Financial Results**

70.     On March 9, 2023, the Company filed with the SEC a Form 8- K that attached a press release announcing the resignation of CFO Bufano and the appointment of a new CFO Annie Mitchell, effective April 24, 2023. Bufano would remain with Allbirds through the transition period.

71.     Allbirds also attached a press release to the 8-K announcing the fourth quarter and full year 2022 financial results, including a net loss of $101.4 million for full year 2022 and an adjusted EBITDA loss of $60.4 million for the year. Despite the Company's previous full year guidance of a gross profit of $187.5–$195 million, the Company's gross profit totaled $129.6 million compared to $146.7 million for the same period in 2021. The press release continued, in part:

> •Full year 2022 net revenue increased 7% to $297.8 million compared to 2021 and increased 36% compared to 2020.
> •Full year 2022 United States (U.S.) physical retail channel sales grew 60% compared to 2021; opened 19 stores in the United States during the year, ending the period with 42 locations in the United States
> •Full year 2022 net loss of $101.4 million, or $0.68 per basic and diluted share.
> •Fourth quarter 2022 net loss of $24.9 million, or $0.17 per basic and diluted share.
> •Full year 2022 adjusted EBITDA loss of $60.4 million.
> •Fourth quarter 2022 adjusted EBITDA loss of $12.5 million, including a $3.5 million loss primarily associated with the previously announced discontinuation of certain first-generation apparel
> •Reduced the carbon footprint of top 10 products by 22% in 2022 compared to 2021.
>
> *       *       *
>
> Gross profit totaled $129.6 million1 compared to $146.7 million for the same period in 2021, while gross margin declined to 43.5% versus 52.9% in 2021. The decrease in gross margin is primarily due to the previously announced discontinuation of certain first generation apparel, the impact of promotions,

higher logistics costs, a lower mix of international sales, and unfavorable foreign exchange rates, partially offset by a higher mix of margin accretive retail store sales.

(Footnotes omitted).

72.     The Company's net loss margin was 34.0% compared to 16.4% in 2021 and the adjusted EBITDA margin declined to negative 20.3% compared to negative 4.2% for 2021. In the press release, Zwillinger stated: "2022…came to a challenging close, with results below our expectations due to both execution and macro challenges."

73.     In response to the negative financial results, the Company announced a transformation plan to "drive sustained and profitable growth," with a focus on several key transformation areas, with the press release stating in part:

> Allbirds is announcing a strategic transformation plan to reignite growth in the coming years, as well as improve capital efficiency, and drive profitability. The plan focuses on four key areas:
>
> •Reignite product and brand
> ◦Executing a highly-focused brand strategy that reconnects with core consumers.
> •Optimize U.S. stores and slow pace of openings.
> ◦Driving traffic and conversion to our U.S. fleet and selectively expanding our third party wholesale channel.
> •Evaluate transition of international go-to-market strategy
> ◦Evaluating potential distributor partners in certain international markets to grow internationally in a cost- and capital-efficient manner.
> •Improve cost savings and capital efficiency
> ◦Building upon and further accelerating 2022 cost and cash optimization initiatives to accelerate cost of revenue savings and SG&A savings, and improve cash optimization.

74.     On March 9, 2023, the Company held an earnings call with analysts and investors to discuss the year-end 2022 financial results. On the call, Defendant Zwillinger admitted that the Company had made "some missteps," including overemphasizing non-core products and underinvesting in the Company's core products, stating in part:

However, in this journey we also made some missteps. First, *we overemphasized products that extended beyond our core DNA*. And as a result, some products and colors have had narrower appeal than expected. Because we were spending significant time and resources on these new products that did not resonate well, *we underinvested in our core consumers' favorite products.* Finally, we did not increase our brand awareness to the level that we anticipated.

In essence, over the past couple of years, we shifted our focus away from our core consumer and we must refocus sharply on this large and attract [sic] group. Taking a look at Q4 specifically this dynamic was exacerbated by the fact that the final weeks of December were exceptionally promotional and we did not sufficiently promote to meet consumers' expectations. As a result, Q4 was the first quarter of negative growth in our history. We are disappointed with these results. And we know that, as we look ahead the status quo is not enough.

(Emphasis added).

75.    Defendant Zwillinger discussed the Company's transformation plan, including an plan to reconnect "with our core consumer" and drive "brand momentum through product and marketing." Defendant Zwillinger acknowledged that Allbirds "over-invested in seasonal trend colors and new silhouettes like the Pacer and Flyer and had "yet to commercialize them effectively." According to Zwillinger, the Company had come to realize its mistake of "overinvestment on newness" which "came at the expense of focus on consumers, who are loyal to our brands and on nurturing our core franchises, such as the Runner and Dasher."

76.    CFO Bufano stated that in light of the transformation and SEC guidance, the Company was adjusting its accounting metrics and consequently its guidance, stating in part:

Also, in light of the strategic transformation and in order to align with these expressed by members of the staff of the SEC following the receipt of a routine comment letter in December, we are no longer excluding from our non-GAAP measures the revenue and cost of revenue associated with the previously announced discontinuation of our first-generation apparel business. Our guidance targets for Q4 net revenue and adjusted EBITDA loss did exclude these items. The impact of this change, compared to our guidance targets, was an increase to Q4 revenue of $1.5 million, a decrease to Q4 gross profit of $3.5 million and an increase to Q4 adjusted EBITDA loss of $3.5 million.

77.     CFO Bufano also disclosed "weaker than expected new customer acquisition and repeat purchase behavior, which resulted in an 11% decrease in active customers."

78.     On the call, Defendant Brown highlighted the transformation plan as a "fresh look at how we deliver on our commitment to develop premium, differentiated and sustainably built products ***so that we can better connect with our core consumer and reignite growth***." (Emphasis added).

79.     Defendant Zwillinger admitted that the Company failed to execute well following the launch of the Dasher, stating in part:

> We just found out that the customers that … are in our sweet spot aren't resonating with a core technical performance messaging. And some of that missed execution by us, I think, boils down to us having a little bit of difficulty with signal and noise as we launched the Dasher and saw really tremendous success.

80.     One analyst asked if the need to liquidate inventory quickly would impact the core brand. Defendant Zwillinger responded that the Company was "making sure that we protect the core" which would be a "continued strategy" and "thoughtful and measured," despite the Company's failure to execute on such a strategy up until that point.

81.     On the heels of the disappointing financial news and the announcement of the transformation plan, Allbirds's stock price plummeted 47% from the previous day's close of $2.36 per share to $1.25 per share on March 10, 2023. The Company's stock price has fallen more than 90% from its $15.00 per share IPO price.

82.     On March 10, 2023, the Company filed with the SEC its Annual Report on Form 10-K, which was signed by each of the Individual Defendants. In the 10-K, the Individual Defendants reported huge losses for the year and an accumulated deficit of $238.7 million, stating in part: "We incurred net losses of $101.4 million, $45.4 million and $25.9 million in in 2022, 2021 and 2020, respectively, and we had an accumulated deficit of $238.7 million as of

December 31, 2022. We expect to continue to incur significant losses in the future."

83.     On May 10, 2023, the Company filed with the SEC its Quarterly Report on Form 10-Q and announced another round of layoffs, cutting 9% of its U.S. corporate staff.

**Allbirds's False And Misleading Proxy Statement**

84.      On April 27, 2023, the Company filed its 2023 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Zwillinger and Levitan to the Board. The Board authorized the Proxy Statement and it was signed by Defendants Zwillinger and Brown.

85.     The 2023 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures, stating in part:

> Our Board of Directors oversees our risk management processes. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. The Board has overall responsibility for evaluating key business risks faced by the Company, including but not limited to privacy, technology, information security (including cyber security and back-up of information systems), competition, and regulation. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight.

86.     The 2023 Proxy Statement represents that the Audit Committee engages in vigorous oversight of risks to Allbirds, the adequacy of the Company's internal controls, and compliance with all legal and regulatory requirements. For example, the Proxy lists the following specific responsibility of the Audit Committee, among others:

> • overseeing the Company's accounting and financial reporting processes, systems of internal control, financial statement audits, and the integrity of the Company's financial statements;
>
> • reviewing any reports or disclosures required by applicable law and listing requirements of any stock exchange on which the Company's securities are listed;

• overseeing the design, implementation, organization, and performance of the Company's internal audit function; and

• helping the Board oversee the Company's privacy and information security policies and legal and regulatory compliance, including risk assessment.

87.     The 2023 Proxy Statement represents that the Governance Committee reviews and assesses "the adequacy of the Company's corporate governance guidelines" and, as appropriate, recommends "any proposed changes to the Board for its consideration and approval.

88.     The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing its core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) oversee and monitor the material risks facing the Company effectively; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

89.     On June 13, 2023, Allbirds filed with the SEC a Form 8-K announcing, among other things, the reelection of Defendants Zwillinger and Levitan to the Board pursuant to the solicitations in the 2023 Proxy Statement.

## HARM TO ALLBIRDS

90.     As a direct and proximate result of the Individual Defendants' misconduct, Allbirds has lost and expended, and will lose and expend, millions of dollars.

91.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

92.     Such losses also include, but are not limited to, significant compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

93.     As a direct and proximate result of the Individual Defendants' conduct, Allbirds has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

94.     As a result of the foregoing, the Securities Class Action was filed, alleging claims for violations of the Exchange Act and the Securities Act. The Securities Class Action has exposed the Company to substantial class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

96.     Plaintiff will adequately and fairly represent the interests of Allbirds and its stockholders in enforcing and prosecuting its rights.

97.     Plaintiff an Allbirds stockholder and has been a continuous stockholder of Allbirds at all relevant times.

98.     Allbirds is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99.     At the time this action was commenced, the Board consisted of the seven Individual Defendants: Blumenthal; Boyce; Brown; Fields; Levitan; Zwillinger; and Freeman.

Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

100.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

101.    The Individual Defendants either knowingly or recklessly issued or caused Allbirds to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

102.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to

these claims. Specifically, as Board members of Allbirds, the Individual Defendants knew, or should have known, the material facts surrounding the shipment delays and the Company's inventory management issues.

103.   The Individual Defendants derive substantial compensation from Allbirds, control Allbirds, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Thus, any demand on the current Board would be futile.

104.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Allbirds. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Allbirds, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

105.   The Induvial Defendants as Directors of Allbirds, were required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company

was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) oversee and monitor the material risks facing the Company effectively; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

### Defendant Blumenthal

106.    Blumenthal is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

107.    Blumenthal and Zwillinger have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Blumenthal and Zwillinger were best friends from their days at the Wharton School at the University of Pennsylvania ("Wharton").[5] Zwillinger touted the support of his Wharton friends, such as Blumenthal: "Some of my best friends from Wharton have been some of my best allies in business." Blumenthal and Zwillinger created a venture capital fund, Good Friends, with two other Wharton classmates to address the climate crisis, and the fund has made more than sixty investments in various companies.[6]

108.    Blumenthal authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

109.    Blumenthal signed the Offering Materials which contained false and misleading statements.

---

[5] Christine Speer Lejeune, *Wharton Magazine, Start Me Up*, https://magazine.wharton.upenn.edu/issues/spring-summer-2020/start-me-up/ (Spring/Summer 2020) ("*Wharton Magazine*").
[6] *The Pennsylvania Gazette*, https://thepenngazette.com/threading-lightly/ (August 18, 2021) ("*Pennsylvania Gazette*").

110.    Blumenthal is neither independent nor disinterested. Any demand upon Defendant Blumenthal is futile and, thus, excused.

### Defendant Boyce

111.     Boyce is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

112.    Boyce, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds' compliance with relevant laws, rules, and regulations. Boyce utterly failed to perform these essential duties.

113.    Boyce, as Chair of the Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Allbirds' Corporate Governance Principles. Boyce utterly failed to perform these duties.

114.    Boyce authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

115.    Boyce signed the Offering Materials which contained false and misleading statements.

116.    Boyce is neither independent nor disinterested. Any demand upon Defendant Boyce is futile and, thus, excused.

### Defendant Brown

117.     Brown is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

118.     Defendant Brown is the Company's Co-Founder and has been its Chief

Innovation Officer since May 4, 2023. Brown served as Co-CEO from October 2015 until May 4, 2023, and an Allbirds director since May 2015. Brown therefore is not independent. Allbirds's 2023 Proxy Statement does not list Brown as an independent director.

119.    Defendants Brown and Zwillinger have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Defendant Brown came up with the idea of Allbirds, but he needed a partner with experience establishing a supply chain to pursue this idea.[7] Brown chose Zwillinger, an industrial engineer and a Wharton graduate, who was running a chemicals business unit of a biotech company. *Id*. Zwillinger's wife and Brown's wife are best friends who roomed together in college at Dartmouth, and Zwillinger was among the early investors in Brown's original Kickstarter campaign for Allbirds. *Id*. Brown and Zwillinger were introduced by their wives. Brown and Zwillinger walked the California hills "for three days and coalesced a partnership that would be bigger than the individual pieces," according to Zwillinger.[8]

120.    Brown signed the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

121.    Brown signed the Offering Materials which contained false and misleading statements.

122.    Brown is neither independent nor disinterested. Any demand upon Defendant Brown is futile and, thus, excused

### Defendant Fields

123.    Fields is named as a defendant in the pending Securities Class Action. As such,

---

[7] Tom Huddleston Jr., CNBC, *How Allbirds went from Silicon Valley Fashion Staple to a $1.4 Billion Sneaker Start-Up*; https://www.cnbc.com/2018/12/14/allbirds-went-from-silicon-valleystaple-to-billion-sneaker-startup.html (Dec. 18, 2018) ("CNBC")
[8] *Pennsylvania Gazette*

she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

124.    Fields, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds' compliance with relevant laws, rules, and regulations. Fields utterly failed to perform these essential duties.

125.    Fields authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

126.    Fields signed the Offering Materials which contained false and misleading statements.

127.    Fields is neither independent nor disinterested. Any demand upon Defendant Fields is futile and, thus, excused.

### Defendant Levitan

128.     Levitan is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

129.    Levitan is a Managing Member of Maveron which beneficially owns 16,824,330 Allbirds Class B shares, with voting control over approximately 26.9% of the outstanding Allbirds common stock. As an early investor in the Company, Maveron led a Series A fundraising round for Allbirds which raised $7.25 million in 2016.[9] Maveron was Allbirds's largest shareholder before the Company's IPO with a stake worth around $400 million based on the Company's opening stock price.[10]

---

[9] *Fashion*, https://us.fashionnetwork.com/news/Allbirds-secures-7-25m-series-a-round-newcolours-announced,729686.html (Sept. 8. 2016).
[10] Taylor Soper, *GeekWire, https://www.geekwire.com/2021/allbirds-secret-sauce-early-investorreflects-shoe-companys-success-goes-public/* (Nov. 3, 2021).

130.    Levitan, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds's compliance with relevant laws, rules, and regulations. Levitan utterly failed to perform these essential duties.

131.    Levitan authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132.    Levitan benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Allbirds Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

133.    Levitan signed the Offering Materials which contained false and misleading statements.

134.    Levitan is neither independent nor disinterested. Any demand upon Defendant Levitan is futile and, thus, excused.

**Defendant Zwillinger**

135.    Zwillinger is the Co-Founder of Allbirds, has been Allbirds CEO since May 4, 2023, and is the Company's President and a director since the Company's inception. Zwillinger also served as Co-CEO from October 2015 until May 4, 2023. Zwillinger therefore is not independent. Allbirds's 2023 Proxy Statement does not list Zwillinger as an independent director.

136.    As an employee of Allbirds, the Company provides Defendant Zwillinger with his principal occupation from which he receives substantial compensation, including $4,449,210 in 2022. Thus, Zwillinger could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

137.    Zwillinger is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

138.    Defendants Zwillinger and Brown have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Defendant Brown came up with the idea of Allbirds, but he needed a partner with experience establishing a supply chain to pursue this idea.[11] Brown chose Zwillinger, an industrial engineer and a Wharton graduate, who was running a chemicals business unit of a biotech company. *Id*. Zwillinger's wife and Brown's wife are best friends who roomed together in college at Dartmouth, and Zwillinger was among the early investors in Brown's original Kickstarter campaign for Allbirds. *Id*. Brown and Zwillinger were introduced by their wives. Brown and Zwillinger walked the California hills "for three days and coalesced a partnership that would be bigger than the individual pieces," according to Zwillinger.[12]

139.    Defendants Zwillinger and Blumenthal have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Zwillinger and Blumenthal were best friends from their days at the Wharton. Zwillinger's Wharton network, including Blumenthal as the Co-CEO of Warby Parker, supported Brown and Zwillinger in the early days of Allbirds by connecting the pair to investors and innovators.[13] Zwillinger touted the support of his Wharton friends, such as Blumenthal: "Some of my best friends from Wharton have been some of my best allies in business." *Id*. Zwillinger and Blumenthal created a venture capital fund, Good Friends, with two other Wharton classmates to address the climate crisis, and the fund has made more than sixty investments in

---

[11] CNBC
[12] *Pennsylvania Gazette*
[13] *Wharton Magazine*

various companies.[14] Zwillinger jokes that Wharton "was pretty good to me. I got a wife and through her found a business partner. I got great friends who support me in my business endeavors and invest with me." *Id.*

140.   Zwillinger signed the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

141.   Zwillinger benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Allbirds Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

142.   Zwillinger signed the Offering Materials which contained false and misleading statements.

143.   Any demand upon Defendant Zwillinger is futile and, thus, excused.

### Defendant Freeman

144.   Freeman authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

145.   Freeman, as a member of the Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Allbirds' Corporate Governance Principles. Freeman failed to perform these duties.

146.   Freeman is neither independent nor disinterested. Any demand upon Defendant Freeman is futile and, thus, excused.

147.   Accordingly, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

---

[14] *Pennsylvania Gazette*

## CLAIM I
### Against the Individual Defendants for Violations of
### § 14(A) of the Exchange Act

148.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

149.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

150.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

151.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

152.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that the Individual Defendants each violated their fiduciary duties to Allbirds and its stockholders by, among other things, failing to: (1) implement and maintain an

effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) oversee and monitor the material risks facing the Company effectively; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the Proxy Statement contained false and misleading statements related to risk oversight by the Board and responsibilities of the Audit Committee and the Governance Committee.

153.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading and omitted material information.

154.   The false and misleading statements in, and information omitted from, the 2023 Proxy Statement were material to Allbirds's shareholders in determining whether to, among other things, elect Defendants Zwillinger and Levitan to the Board.

155.   The material misstatements and omissions in the Proxy Statement damaged the Company.

156.   Plaintiff, on behalf of Allbirds, seeks relief for damages inflicted upon the Company based on the misleading 2023 Proxy Statement in connection with the improper election of Defendants Zwillinger and Levitan.

**CLAIM II**

**Against Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan for Contribution for Violations of §21D of the Exchange Act**

157.    The conduct of Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

158.    Allbirds, Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Allbirds is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

159.    If Allbirds is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Zwillinger, Blumenthal, Boyce, Brown, Fields, and/or Levitan as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

160.    As officers and directors, Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan had the power or ability to, and did, control or influence, either directly or indirectly, Allbirds's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

161.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution

asserted pursuant to the federal securities laws.

162.   Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan have damaged the Company and are liable to the Company for contribution.

163.   As such, Allbirds is entitled to receive all appropriate contribution or indemnification from Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan.

**CLAIM III**
**Against the Individual Defendants for Breach of Fiduciary Duty**

164.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

165.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

166.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

167.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of news about Allbirds to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

43

169.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

170.     Plaintiff, on behalf of Allbirds, has no adequate remedy at law.

## CLAIM IV
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

171.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

172.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste Allbirds's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

173.     Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

174.     Plaintiff, on behalf of Allbirds, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.       Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained

of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.       Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.       Awarding punitive damages;

D.       Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 3, 2023

**RIGRODSKY LAW, P.A.**

By: */s/ Seth D. Rigrodsky*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Counsel for Plaintiff*

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone

45

275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com